Filed 3/17/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B331764 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA141727) |
| v. | |
| MISAEL PADRON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra A. Cole, Judge. Reversed and remanded with instructions.

Christopher Lionel Haberman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Misael Padron appeals the denial of his motion under Penal Code section 1473.7 to vacate his conviction for carjacking pursuant to a no-contest plea.[1]  Padron had served his three-year sentence, and he explained in his motion that he was born in Cuba, moved to the United States, and was granted asylum due to persecution by the Cuban government.  Padron provided evidence that when he entered his plea, he suffered from mental health challenges relating to his persecution, and that he did not understand his conviction qualified as an aggravated felony and carried mandatory immigration consequences.  These included automatic detention, denial of naturalization, and near-certain termination of asylum and deportation.  The superior court denied Padron's motion, in part, because he did not provide a declaration from his defense counsel at the time of his plea.  The court also stated Padron signed a standard plea form acknowledging he "must expect" to be deported if he was not a United States citizen, and that there was no alternative, immigration-neutral plea available to Padron.

We conclude Padron demonstrated error affecting his ability to "meaningfully understand, defend against, or knowingly accept" the immigration consequences of his plea. (§ 1473.7, subd. (a)(1).)  Padron also established a reasonable probability he would have rejected his plea had he understood the consequences.  Accordingly, we reverse the denial of Padron's motion and direct the superior court to vacate Padron's conviction.

---

[1]     Undesignated statutory references are to the Penal Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *Underlying Plea Proceedings*

On April 16, 2016, Juan Estrella stepped away from his automobile while filling the radiator, leaving the keys in the ignition and the engine running.  Padron entered the empty vehicle and sat in the driver's seat.  When Estrella confronted him, Padron pushed Estrella aside and drove away, hitting a parked car.

Three days later, Padron was charged with carjacking (count 1; § 215, subd. (a)), driving or taking a vehicle without consent (count 2; Veh. Code, § 10851, subd. (a)), vandalism (count 3; § 594, subd. (a)), and hit-and-run driving resulting in property damage (count 4; Veh. Code, § 20002, subd. (a)).  The complaint alleged as to counts 1 through 3 that Padron had served two prior felony prison terms (§ 667.5, subd. (b)), and as to count 2 that Padron had a prior felony conviction for theft of a vehicle (§ 666.5).

At the time of his plea, Padron was experiencing mental health challenges relating to untreated post-traumatic stress disorder (PTSD) caused by persecution endured when he was in his home country.  He met with his public defender twice while in a holding cell for approximately 10 minutes each time.  A contemporaneous note in his counsel's file described Padron as "still going out nuts."  Padron and his counsel appeared at a scheduled preliminary hearing on May 9, 2016.  Padron waived his right to a preliminary hearing and pleaded no contest to carjacking in exchange for a prison sentence of three years and the dismissal of all other charges and allegations.

3

Padron executed a plea form, also known as a *Tahl* waiver, initialing a section titled "Immigration Consequences."[2]  The *Tahl* waiver read:  "I understand that if I am not a citizen of the United States, I must expect my plea of guilty or no contest will result in my deportation, exclusion from admission or reentry to the United States, and denial of naturalization and amnesty."  During the plea hearing, the prosecutor reviewed the plea form with Padron.  As relevant here, the prosecutor stated, "If you are not a citizen of the United States, your conviction in this case will result in your removal, deportation, exclusion from the U.S., and denial of naturalization.  Have you discussed the immigration consequences with your attorney?"  Padron said he had.  The prosecutor continued, "[D]o you understand that the district attorney's office will not extend an offer that has no immigration consequences?"  Padron answered yes.

The court accepted Padron's plea.  Pursuant to his plea agreement, Padron was sentenced to three years in prison.

B.    *Padron's Section 1473.7 Motion*

On November 4, 2022, and after serving his sentence, Padron filed a motion to vacate his conviction under section 1473.7, alleging he did not understand the immigration consequences of his plea.

Padron submitted a declaration stating he was a citizen of Cuba and had been in the United States since 2002.  Padron

---

[2]    *In re Tahl* (1969) 1 Cal.3d 122, 132 (advising trial courts to obtain "express waiver on the record" of rights waived by a criminal defendant before accepting a guilty plea), superseded by statute as stated in *People v. Carty* (2003) 110 Cal.App.4th 1518, 1523-1524.

obtained asylum in 2012 because of persecution he experienced in Cuba as a human rights activist.  Padron provided a copy of the immigration court's order granting him asylum.  He attested he was arrested and beaten three times in Cuba for his political activism.  Padron stated, "Cuban officers . . . handcuffed me to a pole about ten or twelve feet high and hung me from the very top for several days . . . beat[ing] me the entire time I was arrested."  Padron further stated, "Immigration officials are trying to strip me of my asylee status because of this conviction.  I need to stay in the United States because I fled persecution from Cuba already.  There is no other country I can go to."

Padron described that, at the time of his plea, he was "homeless and suffering from paranoia and PTSD" because he "felt like Cuban officials were after me here in the United States."  Padron supplied a copy of a 2019 psychological evaluation performed while in immigration detention, diagnosing Padron with PTSD and noting his past use of stimulant drugs.  Padron attested he only spoke to his public defender "two times for about ten minutes each time."  He stated his public defender "never asked me for my [immigration] status," "did not talk at all about the immigration consequences of my conviction" and did not consult with or refer Padron to an immigration attorney.  As a result, Padron "did not have a full understanding of just how dire the [immigration] consequences were."

Padron averred that, "If I had properly understood all the immigration consequences of my conviction, I would have been willing to agree to a plea bargain for a more serious charge if it did not have these life-long immigration consequences.  I would have been willing to spend more time in jail."  He further stated, "If a plea bargain could not be reached . . . , I would have been

5

willing to go to trial to try to avoid these consequences. I had too much to lose to voluntarily accept a plea that would make me permanently ineligible for a green card." Padron stated he was employed full-time as a cook in San Francisco, with two daughters living in Mexico who had "status to be in the United States." Padron stated he wished to obtain permanent residency "and petition for my daughters as soon as I can."

Padron also provided a declaration from Keli Reynolds, a California attorney specializing in immigration law and "the immigration consequences of criminal convictions." Reynolds explained Padron's carjacking conviction under section 215, subdivision (a),[3] was considered an "aggravated felony" and constituted "a ground of deportability, a bar to naturalization, a statutory bar to asylum, and a ground of mandatory detention."[4] As a result, Reynolds opined, "Mr. Padron, who is now in removal proceedings, is facing a very significant likelihood of having his asylum status terminated" and "any attempt by Mr. Padron to

---

[3]    Carjacking under section 215 is "the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence . . . against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear." (§ 215, subd. (a).) The term of imprisonment for carjacking is three, five, or nine years. (See *id*., subd. (b).)

[4]    8 U.S.C. § 1101(a)(43)(F), defines an aggravated felony as "a crime of violence . . . for which the term of imprisonment [is] at least one year." A "crime of violence," in turn, is "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." (18 U.S.C. § 16(a).)

6

seek permanent residency (most commonly referred to as a green card) is almost certain to fail." Reynolds stated that although Padron's defense attorney warned of "'potential immigration consequences' of his plea . . . the aggravated felony consequences of the plea are mandatory." Reynolds also noted Padron could have pleaded to different charges carrying the same sentence but with lesser immigration consequences. These alternative dispositions included pleading to "a violation of Penal Code § 136.1(b) [witness intimidation] and/or Penal Code § 237 [false imprisonment], with the same 3-year prison sentence." "Additional pleas to Vehicle Code § 10851 [theft and unlawful driving of vehicle] and/or Penal Code § 594 [vandalism] (which was one of the original charges) could also have been included in a plea."

Finally, Padron submitted letters from his wife, his daughter Karmina, and four current coworkers. In July 2022, when these letters were written, Padron's wife and two daughters lived in Mexico. Padron's family and coworkers stated Padron had been sober for over six years and had "profoundly changed." They described his involvement in his church and in sobriety support meetings, his friendships with coworkers and customers, and his role as a dedicated father motivated by his daughters.

The People opposed Padron's motion to vacate his plea, arguing Padron had signed a *Tahl* waiver and, during the plea colloquy, Padron had acknowledged discussing immigration consequences with his attorney.

On reply, Padron submitted case notes from his public defender. The public defender's notes stated Padron was "still going out nuts" on April 19, 2016, and reflected the proposal of plea deal on April 25, 2016. The original plea proposal was for

7

three years in state prison on counts 3 and 4 of the indictment: vandalism (§ 594, subd. (a)), and hit-and-run driving (§ 20002, subd. (a)). On May 9, the notes state Padron "now wants . . . offer of 3 yrs. state prison (on ct. 1 (P.C. 215(a) only) . . . even though [defendant] knows (and fully advised) that ct. 1 is a 'future' strike and is a 'violent' offense." The notes reflected Padron accepted this plea on May 9, 2016 and was "advised of potential imm. csqs."

Padron also submitted a declaration from his second daughter Shanthal, dated January 3, 2023. Her letter explained Padron's daughters and wife had reunited with Padron in San Francisco, and Shanthal was enrolled in a local high school. Shanthal declared, "My dad works two jobs so he can pay all the expenses our family has. . . . My mom only works part time. My dad is the main breadwinner for our family. My dad has made a commitment to me and my sister to support our dream of being college graduates. He doesn't want us to work so that our focus is 100% on school. . . . We would be devastated if my dad was deported."

After a hearing, the superior court denied Padron's motion to vacate his plea. The court suggested it would have preferred to see "something from [Padron's public defender] indicating that he did not explain [the] immigration consequences." The court found Padron knew of the immigration consequences because "the *Tahl* waiver states [Padron] would be deported" and "the prosecution had stated they w[ould] not extend an offer that has no immigration consequences."

Padron timely appealed.

8

**DISCUSSION**

A.  *Governing Law and Standard of Review*

Section 1473.7 provides, as relevant here:  "A person who is no longer in criminal custody may file a motion to vacate a conviction or sentence" if "[t]he conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defendant against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence."  (§ 1473.7, subd. (a)(1).)  "The court shall grant the motion to vacate the conviction or sentence if the moving party establishes, by a preponderance of the evidence, the existence of . . . [such] grounds for relief."  (*Id.*, subd. (e)(1).)  For a motion to vacate a conviction due to failure to understand the immigration consequences, "the moving party shall also establish that the conviction or sentence being challenged is currently causing or has the potential to cause removal or the denial of an application for an immigration benefit, lawful status, or naturalization."  (*Ibid.*)

Under section 1473.7, a petitioner must first show error affecting his ability to understand the immigration consequences. (See *People v. Espinoza* (2023) 14 Cal.5th 311, 319 (*Espinoza*); *People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*).)  The focus of this showing is "the '*defendant's own error* in . . . not knowing that his plea would subject him to mandatory deportation and permanent exclusion from the United States.'"  (*People v. Mejia* (2019) 36 Cal.App.5th 859, 871; accord, *People v. Alatorre* (2021) 70 Cal.App.5th 747, 768-769 ["a petitioner's own subjective error qualifies for relief"].)  To establish error, a petitioner is not required to prove he received ineffective assistance from his

9

counsel. (See § 1473.7, subd. (a)(1) [invalidity of conviction due to misunderstanding immigration consequences "may, but need not, include a finding of ineffective assistance of counsel"]; *People v. Ruiz* (2020) 49 Cal.App.5th 1061, 1067.)

A section 1473.7 petitioner must also demonstrate prejudice, that is, "a reasonable probability that [he] would have rejected the plea if [he] had correctly understood its actual or potential immigration consequences." (*Vivar, supra,* 11 Cal.5th at p. 529.) "A reasonable probability does not mean more likely than not. [Citation.] Instead, it means merely a reasonable chance, which is more than an abstract possibility. . . . In other words, a reasonable probability is a probability sufficient to undermine confidence in the outcome." (*People v. Carrillo* (2024) 101 Cal.App.5th 1, 19 (*Carrillo*); accord, *People v. Rodriguez* (2021) 68 Cal.App.5th 301, 324 (*Rodriguez*).) The prejudice inquiry turns on "the totality of the circumstances," including "the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Vivar,* at pp. 529-530.)

We apply independent review to the denial of a section 1473.7 motion. (See *Vivar, supra,* 11 Cal.5th at p. 527.) Under this standard, we defer to any "factual findings based on the trial court's personal observations of witnesses," but otherwise "'exercise[e] [our] independent judgment to determine whether the facts satisfy the rule of law.'" (*Id.* at pp. 527-528.) Where, as here, the superior court heard no witness testimony and "the facts derive entirely from written declarations and other documents . . . there is no reason to conclude the trial court has

10

the same special purchase on the question at issue; as a practical matter '[t]he trial court and this court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding."  (*Id.* at p. 528.)

B.    *Padron Established Error Affecting His Ability To Understand the Immigration Consequences of His Plea*

Based on our independent review of the record, we conclude Padron demonstrated by a preponderance of the evidence he misunderstood the immigration consequences of his plea due to his mental health challenges and because his defense counsel did not advise him of the mandatory immigration consequences, including the impact on his asylum status.  (See *Padilla v. Kentucky* (2010) 559 U.S. 356, 369 ["when the deportation consequence [of a conviction] is truly clear . . . [counsel's] duty to give correct advice is equally clear"].)

The mandatory immigration consequences of Padron's conviction were plain.  At the time of Padron's plea in 2016, it was clear carjacking under section 215 qualified as a crime of violence (see 18 U.S.C. § 16(a)), and, if the sentence exceeded one year, it was deemed an aggravated felony conviction (see 8 U.S.C. § 1101(a)(43)(F)).  (See *Matter of Omar A. Valenzuela* (BIA 2021) 28 I&N Dec. 418, 420-423 [summarizing historical case law and affirming section 215 is a crime of violence and aggravated felony].)  "A noncitizen who is convicted of an aggravated felony is subject to mandatory deportation and permanent exclusion from the United States."  (*People v. Curiel* (2023) 92 Cal.App.5th 1160, 1174 (*Curiel*); accord, *People v. Manzanilla* (2022) 80 Cal.App.5th 891, 904 (*Manzanilla*); see *Moncrieffe v. Holder* (2013) 569 U.S. 184, 187-188; 8 U.S.C. § 1227(a)(2)(A)(iii).)  An aggravated felony

11

is also grounds for the termination of asylum and categorically prevents future naturalization. (See 8 U.S.C. § 1158(b)(2)(A)(ii), (b)(2)(B)(i) [asylum denial]; 8 C.F.R. §§ 208.24(b)(3) [asylum termination], 316.10(b)(ii) [naturalization denial].)

Padron's declaration and his public defender's case notes both support that Padron was unaware his conviction carried these mandatory immigration consequences. Padron attested his attorney did not inquire into his immigration status or discuss "all of the immigration consequences of my conviction." According to the case notes, Padron's public defender advised only of unspecified, "potential" immigration consequences. Counsel's notes reflect Padron received this advice on the date of the plea hearing, although counsel discussed a potential plea deal more than two weeks before. The notes also do not reflect Padron's attorney knew of his asylum status or consulted any relevant immigration resources.[5]

Under these circumstances, counsel's "failure to give accurate and complete advice about the specific consequences of the plea agreement," including mandatory detention, denial of naturalization, and deportation to a country the immigration

---

[5] The People contend that Padron's declaration is "conclusory and self-serving," citing *People v. Cruz-Lopez* (2018) 27 Cal.App.5th 212. (See *id.* at pp. 223-224 ["An allegation that trial counsel failed to properly advise a defendant [on immigration consequences] is meaningless unless there is objective corroborating evidence supporting appellant's claimed failures."].) *Cruz-Lopez* is inapposite because that case addressed the showing for a Sixth Amendment claim of ineffective assistance of counsel. (*Id.* at pp. 221-222 [concluding section 1473.7 "not applicable"].) And in any event, Padron's declaration is corroborated by his counsel's notes.

court had found subjected Padron to persecution, was error impeding Padron's ability to understand and knowingly accept the consequences of his no-contest plea. (*Curiel*, *supra*, 92 Cal.App.5th at pp. 1176-1177 [section 1473.7 error established where counsel did not explain plea would cause "mandatory removal . . . and effectively bar [defendant] from gaining lawful status in the future"]; see *Vivar*, *supra*, 11 Cal.5th at pp. 519, 533 [same, where counsel advised of "'the potential for immigration consequences'" but "deportation in these circumstances was mandatory—and when [defendant] accepted the plea deal, he remained unaware of that crucial fact"]; *Manzanilla*, *supra*, 80 Cal.App.5th at pp. 905-906 [same, where counsel's "contemporaneous notes" showed no advice defendant's "removal was virtually certain"].)

Padron presented further evidence of his subjective misunderstanding of the immigration consequences due to a mental health crisis at the time of his plea. Padron attested that when he pleaded no contest, he was suffering from untreated PTSD and "in a terrible place both mentally and physically," which impaired his ability to understand the immigration consequences. His counsel's notes corroborate Padron was "going out nuts" at the time of his plea, and a later psychological evaluation confirmed Padron suffered from PTSD. (See *People v. DeMontoya* (2022) 85 Cal.App.5th 1159, 1181-1182 [defendant may present evidence his "mental health prohibited [him] from meaningfully understanding, defending against, or knowingly accepting the actual or potential adverse immigration consequences of [a] plea"].) These circumstances further support Padron did not subjectively understand the immigration consequences of his plea.

13

The People emphasize Padron signed a *Tahl* waiver stating that, if he was "not a citizen of the United States," he "must expect [his] plea of . . . no contest will result in [his] deportation, exclusion from admission or reentry to the United States, and denial of naturalization and amnesty." The prosecutor repeated this language during Padron's plea colloquy, asked whether Padron had "discussed the immigration consequences with [his] attorney," and further advised her office would "not extend an offer that has no immigration consequences." It is well established, however, that a *Tahl* waiver does "not absolve defense counsel of the duty to advise of immigration consequences. Even where the [*Tahl*] form says that the defendant 'will' be deported, it does not substitute for the advice of counsel, and it is not a categorical bar to relief." (*Manzanilla, supra*, 80 Cal.App.5th at p. 906; accord, *Curiel, supra*, 92 Cal.App.5th at p. 1175; *People v. Rodriguez* (2021) 60 Cal.App.5th 995, 1003-1004; cf. *In re Hernandez* (2019) 33 Cal.App.5th 530, 545 [ineffective assistance where defense counsel advised of "'possible . . . immigration consequences'" and defendant signed *Tahl* waiver, but defendant did not understand deportation was mandatory].)

The People argue the prosecutor verbally advised Padron during the plea hearing of deportation if he was not a United States citizen. Indeed, section 1016.5 requires a plea colloquy to advise a defendant of immigration consequences.[6] But it is also

_____

6      As relevant, section 1016.5 provides: "Prior to acceptance of a plea of guilty or nolo contendere to any offense punishable as a crime under state law, . . . the court shall administer the following advisement on the record to the defendant: [¶] If you

14

well established that the standard immigration advisement under section 1016.5 also does not replace the case-specific advice of counsel.  (See *Espinoza, supra,* 14 Cal.5th at p. 320 ["general advisement under section 1016.5" does not establish meaningful understanding of immigration consequences]; *Curiel, supra,* 92 Cal.App.5th at p. 1175; *People v. Camacho* (2019) 32 Cal.App.5th 998, 1011, fn. 8 (*Camacho*) ["court's advisement" that plea will result in adverse immigration consequences does not preclude section 1473.7 showing where "defendant presented sufficient evidence of his lack of understanding"].)  This is especially true because the general advisement of immigration consequences for non-citizens did not speak to Padron's particular status as an asylee.  (See *People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 81 (*Ogunmowo*) [court's warning of immigration consequences for non-citizens did not cure attorney's erroneous advice where the court did not "address[] [defendant's] particular status as a lawful permanent resident"].)

The People also argue Padron did not provide a declaration from his defense counsel admitting he did not adequately advise Padron.  They concede, however, that "[a] party seeking relief under section 1473.7 is not required to provide the declaration of plea counsel."  (*Espinoza, supra*, 14 Cal.5th at p. 325; see *Manzanilla, supra*, 80 Cal.App.5th at p. 909 ["requiring an admission from defense counsel . . . would impose a condition on obtaining relief under section 1473.7 that is not contained in the

_____

are not a citizen, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States."  (§ 1016.5, subd. (a).)

15

statute"].)  And, because defense counsel's own notes only reflect advice of "potential" immigration consequences, Padron's declaration is corroborated by independent evidence in the record and sufficiently demonstrates error affecting his ability to understand the consequences of his plea.  (See *Vivar*, *supra*, 11 Cal.5th at p. 533; *Curiel*, *supra*, 92 Cal.App.5th at pp. 1176-1177; *Manzanilla*, at p. 905.)

C.    *Padron Established Prejudice*

Based on our independent review of the record, we also conclude that, considering the totality of the circumstances, Padron presented evidence demonstrating a reasonable probability he would have rejected the plea deal had he known of its immigration consequences to his asylum status.  (See *Vivar*, *supra*, 11 Cal.5th at p. 529.)  First, Padron demonstrated significant ties to the United States.  "Depending on the strength of a defendant's community ties, 'the prospect of deportation' may be "'an integral part'" . . . of the defendant's 'calculus in responding to certain criminal charges.'  [Citation.]  Community ties may be established by length of residence; immigration status; lack of connection to the country of origin; connections to family, friends, or the community; work history or financial ties; or other forms of attachment."  (*Espinoza*, *supra*, 14 Cal.5th at p. 321.)

At the time of his plea in 2016, Padron had lived in the United States for 14 years.  He pursued legal status, successfully obtaining asylum in 2012.  He had no connection to Cuba, where he experienced persecution by government officials.  Indeed, the record supports Padron would have highly prioritized avoiding deportation to his home country of Cuba.  (Cf. *Vivar*, *supra*,

16

11 Cal.5th at p. 530 [prejudice established where defendant had "virtually no ties" to country of birth and was "treat[ed] . . . like an outsider" there]; *Manzanilla*, *supra*, 80 Cal.App.5th at p. 912 [same, when the last time defendant visited country of birth "he was assaulted due to his sexual orientation and never returned"].)  This circumstance is independently corroborated by the immigration court granting Padron asylum.  (See 8 U.S.C. §§ 1101(a)(42)(A) [asylum applicant must prove he "is unable or unwilling to return to . . . [his] country because of persecution . . . on account of race, religion, nationality, membership in a particular social group, or political opinion"], 1158(b)(1)(B)(i); *Espinoza*, *supra*, 14 Cal.5th at p. 321 [emphasizing "objective evidence" corroborating defendant's factual assertions].)

Further, Padron's goal was to achieve permanent status as a resident alien and to sponsor his family, who eventually joined him in 2023.  Padron's history of residence, his asylum status, his lack of connection to his country of origin, his progress toward his goal of legal status for his family, and his connections with his church community, support groups, and coworkers support that "his community ties were important to him at the time of his plea."  (*Espinoza, supra,* 14 Cal.5th at p. 323 [citing defendant's decades-long residency, presence of family, participation in church and community organizations before and after plea]; accord, *Vivar, supra,* 11 Cal.5th at pp. 530-531 [considering defendant's post-plea conduct as evidence of his priority to preserve immigration status].)  These connections were substantiated by declarations from Padron's coworkers and family members.  (See *Espinoza,* at p. 321 ["Objective evidence of a defendant's community ties includes facts provided by a

17

defendant's declaration or declarations from family members, friends, [and] colleagues."].)

To ascertain prejudicial error, we also consider "whether alternative, immigration-safe dispositions were available at the time of the defendant's plea. Factors relevant to this inquiry include the defendant's criminal record, the strength of the prosecution's case, the seriousness of the charges or whether the crimes involved sophistication, the district attorney's charging policies with respect to immigration consequences, and the existence of comparable offenses without immigration consequences." (*Espinoza*, *supra*, 14 Cal.5th at p. 323.)

The parties agree that at the time of his plea, Padron faced a maximum sentencing exposure of 10 years and two months. Padron concedes the evidence against him presented "a strong case." Relying on the declaration of his immigration law specialist, Padron argues he could have pursued a plea deal on equivalent charges without or with lesser immigration consequences. (See *Espinoza*, *supra*, 14 Cal.5th at p. 324 [defendant's "expect[ation] or hope" of different plea supported by declaration of an immigration attorney describing alternative charges that would not lead to mandatory deportation].) He attested he would have pleaded to "a more serious charge" and accepted "more time" in prison to avoid immigration consequences.

The People do not respond to the declaration from Padron's immigration specialist. Instead, they argue the prosecution expressly stated it would not offer a plea deal with no immigration consequences, especially in light of Padron's two prior felony convictions in 2014 and 2015. (See *Espinoza, supra,* 14 Cal.5th at pp. 324-325 ["lack of a criminal history" supported

18

defendant's "assertion that he had reason to expect or hope for a plea bargain without immigration consequences"].)  But whether Padron could have secured a more favorable plea deal or prevailed at trial does not conclusively determine whether he established prejudice under section 1473.7.  Rather, "'[c]ommon sense . . . recognizes that there is more to consider than simply the likelihood of success at trial.  The decision whether to plead guilty also involves assessing the respective consequences of a conviction after trial and by plea.'" (*Camacho*, *supra*, 32 Cal.App.5th at pp. 1010-1011.)  For this reason, "relief should be granted if the court . . . determines the defendant would have chosen not to plead guilty or nolo contendere, even if the court also finds it not reasonably probable the defendant would thereby have obtained a more favorable outcome." (*People v. Martinez* (2013) 57 Cal.4th 555, 559; accord, *Espinoza*, at p. 324; *Vivar*, *supra*, 11 Cal.5th at p. 528; *Camacho*, at p. 1010.)

Considering the totality of circumstances, we conclude Padron raised "more than an abstract possibility" he would have rejected his plea deal had he correctly understood the immigration consequences, particularly given his asylum status. (*Carrillo*, *supra*, 101 Cal.App.5th at p. 19; accord, *Rodriguez*, *supra*, 68 Cal.App.5th at p. 324.)  Padron left his home country after persecution and obtained asylum in the United States after a decade of residency, strongly supporting that remaining in the United States was a high priority.  (See *Ogunmowo*, *supra*, 23 Cal.App.5th at p. 78 [defendant established prejudicial error where he had resided in the U.S. almost 10 years, achieved permanent resident status, and declared he "'would have opted to go to trial if [he] knew that [his] decision to plead guilty would mean automatic deportation and no chance at ever being a U.S.

19

citizen'"]; *Rodriguez*, at p. 325 [strong ties to the U.S. supported that defendant would have gone to trial despite "ample evidence" of guilt].)

Other evidence in the record reflects that, if he had understood the immigration consequences of his plea, there is a reasonable probability Padron would have sought lesser immigration consequences or even proceeded to trial. After meeting with his public defender just twice, Padron waived a preliminary hearing and pleaded no contest. (See *Rodriguez*, *supra*, 68 Cal.App.5th at p. 326 [reasonable probability of rejecting plea deal in hope of immigration-neutral plea where defendant "hardly negotiated" before pleading no contest and thus "never tested the prosecution's resolve"].) Although the prosecution stated it would not extend a plea offer "with no immigration consequences," Padron may have reasonably hoped to secure a plea to a charge with lesser immigration consequences short of mandatory deportation, loss of asylum, and permanent ineligibility for citizenship. (See *Vivar*, *supra*, 11 Cal.5th at p. 520, fn. 2 [aggravated felony conviction "'trigger[s] the worst of all immigration consequences:  mandatory deportation with a bar to almost all forms of immigration relief, and permanent ineligibility for U.S. citizenship'"].) Given Padron's strong interest in preserving his asylum status, it is "equally and reasonably probable that . . . . faced with certain deportation" to a country where he was persecuted by government agents that Padron "would have insisted on pleading no contest to a different, more immigration-neutral charge (whether it was realistic to insist on such a deal or not) or gambled on a 'Hail Mary' trial." (*Rodriguez*, at p. 324.)

## DISPOSITION

The order denying Padron's section 1473.7 motion is reversed, and the case is remanded with instructions to grant the motion, vacate the conviction, and permit Padron to withdraw his plea and to enter a different plea.


MARTINEZ, P. J.

We concur:



SEGAL, J.                              PULOS, J.*

---

*     Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21